UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DOUGLAS GILMORE, EXECUTOR<br>OF THE ESTATE OF BESS GILMORE : | NO. 3:08-CV-01058 (SRU) |
| Plaintiff, | |
| v. | |
| PAWN KING, INC. and<br>WILLIAM V. MINGIONE, | |
| Defendants. : | JANUARY 10, 2011 |

### MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Pawn King, Inc. and William V. Mingione (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment Plaintiff's Complaint.

The central issue in this case is whether Defendant Pawn King's practice of using sale and repurchase agreements with monthly service fees is legal under state law. Plaintiff's entire case is premised on the contention that the sale and repurchase agreements are nothing more than conventional pawnbroking "loans," subject to the interest limits found in Conn. Gen. Stat. § 21-44. Because Pawn King attempted to collect, and in some instances actually did collect, monthly service payments from Plaintiff in excess of the 2% interest limit found in Conn. Gen. Stat. § 21-44, Plaintiff maintains that Pawn King has engaged in the collection of an unlawful debt in violation of federal and state law.

As set forth below, however, each count of Plaintiff's Complaint is predicated on the Connecticut Supreme Court's interpretation of a prior version of Conn. Gen. Stat. §

21-44. See Rhodes v. City of Hartford, 201 Conn. 89 (1986). But that is not the law as it exists today. The statute was amended in 1997 and this amendment legislatively overruled the holding in Rhodes. Indeed, the effect of this amendment has already been acknowledged by a judge of the Connecticut Superior Court in a case that analyzed Defendants' sale and repurchase agreements and held that they do not implicate Conn. Gen. Stat. § 21-44. See Chin v. Mingione, Docket No. CV 02-0087522-S (Conn. Super. Dec. 2, 2003) (Pickard, J.). For the reasons discussed in Chin, and as more fully discussed below, Plaintiff's claims fail as a matter of law and summary judgment should enter in favor of Defendants as to all counts.

## PROCEDURAL BACKGROUND

The original Plaintiff, Bess Gilmore, commenced this action against Defendants by way of a lengthy Complaint dated July 15, 2008 (the "Complaint"). The Complaint is almost fifty (50) pages in length, excluding the seventeen (17) exhibits, and contains twenty (20) counts followed by a three-page prayer for relief. Ms. Gilmore, represented by her attorney-son, Douglas, has asserted claims[1] ranging from violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") pursuant to 17 U.S.C. § 1962(a),(c) to intentional infliction of emotional distress – all arising out of sale and

---

[1] Specifically, Plaintiff has asserted the following claims: violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") pursuant to 17 U.S.C. § 1962(c) (Counts One through Five); violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") pursuant to 17 U.S.C. § 1962(a) (Counts Six through Ten); violation of the Connecticut Unfair Trade Practices Act ("CUTPA") pursuant to Conn. Gen. Stat. § 42-110a et seq. (Count Eleven); conversion pursuant to common law (Counts Twelve and Thirteen); statutory theft (Count Fourteen); intentional infliction of emotional distress (Count Fifteen); unjust enrichment (Count Sixteen); breach of contract (Count Seventeen); breach if implied contract (Count Eighteen); breach of implied duty of good faith and fair dealing (Count Nineteen); violation of the Code of the Town of Stratford (Count Twenty).

repurchase transactions she knowingly and willingly entered into with Pawn King, but which she now claims are illegal.[2]

Given the absence of any genuine issue as to the legality of the agreements, and because Defendants are entitled to judgment as a matter of law, they have moved for summary judgment on Plaintiff's Complaint.

## FACTUAL BACKGROUND

Notwithstanding the length of the Complaint, this is a relatively simple and straightforward case that is ripe for summary judgment. Plaintiff's decedent, Bess Gilmore (Ms. Gilmore), commenced this action against both Pawn King, Inc. ("Pawn King"), a corporation duly organized and existing under the laws of the State of Connecticut, and its President, William V. Mingione ("Mingione") (Mingione Dep. at 13 (Tab A)). At its core, the action concerns the legality of various sale and repurchase transactions entered into by Ms. Gilmore and Pawn King. Although the values of the items associated with the transactions may be different, the terms and conditions of the agreements are largely identical.

Between 2005 and 2007, Ms. Gilmore visited Pawn King to transact business. (Gilmore Dep. at 23 (Tab B).) During each visit, Douglas, an attorney admitted to the bar of the State of Connecticut, accompanied his mother. (Gilmore Dep. at 13-14, 23 (Tab B).) It was Douglas who subsequently filed the instant suit against Defendants on behalf of his mother based on these transactions. (Gilmore Dep. at 19 (Tab B).) After her death, Douglas became the fiduciary of his mother's estate (Gilmore Dep. at 22

---

[2] Because Ms. Gilmore is now deceased, her estate has been substituted as Plaintiff. The fiduciary of the estate is Douglas. (Gilmore Dep. at 22.)

3

(Tab B)), and thereafter chose to continue the prosecution of this action in a representative capacity.

Interestingly, this action is not the first such action brought by Douglas on behalf of his mother against a pawn shop. Ms. Gilmore and her son have done this before. In 2003, Douglas filed an action on behalf of his mother against a pawn shop in Bridgeport in which Ms. Gilmore asserted many of the very same claims, using a remarkably similar complaint. (Gilmore Dep. at 98-99, 102, 106 (Tab B), Ex. 11 (Tab C).) Not only did Douglas assert the same claims on behalf of his mother, but some of the same items of personal property from the 2003 action were used to build his mother's case against Defendants (Gilmore Dep. at 103-106 (Tab B)). Douglas has admitted that, as part of the settlement reached in the 2003 action, Ms. Gilmore secured the return of several items that she sold to another pawn shop; and it is clear that these very same items were then sold to Pawn King to set up the claims in this case. (Gilmore Dep. at 13-14, 23, 103-106 (Tab B) (testifying that certain items appear in both complaints).)

The record also reveals that nothing about the transactions at issue in this case were oppressive or unscrupulous. During each of Ms. Gilmore's trips to Pawn King, she brought with her one or more items and sought cash. (See, e.g., Gilmore Dep. at 25 (Tab B).) In each instance, Ms. Gilmore, with her attorney-son present, sold these items to Pawn King and, after having an opportunity to review the proposed agreement, (Gilmore Dep. at 41-42 (Tab B)), she acknowledged and agreed to such sale by signing the respective agreements, (Gilmore Dep. at 33-34 (Tab B)), each of which contain the title "BUY/SELL AGREEMENT," (Gilmore Dep. at 40 (Tab B), Ex. 2 (Tab D)). A copy of the front and back of a representative agreement, (Gilmore Dep. at 30-31, 52-53, (Tab

4

B)), is attached hereto at Tab D. Just above the line designated for the signature of the "seller," is an acknowledgement as follows:

> I, THE UNDERSIGNED, HAVE CAREFULLY READ THE TERMS AND CONDITIONS ON THE FRONT AND BACK OF THIS AGREEMENT AND AGREE TO THEM.

(Gilmore Dep. at 33, (Tab B), Ex. 2 (Tab D).)

In addition to a statement on the front of the agreement that the customer "[d]id . . . bargain, sell & deliver the . . . property," the terms and conditions contained on the back of the agreement referenced in the acknowledgment are as follows:

> Seller agrees that by signing the signature line on front that this is a draft in exchange for cash.
>
> In consideration of the sum paid by the "Purchaser" and which amount the receipt of which is acknowledged by the named person, the "Seller", said Seller does sell, transfer and assign all rights, title, and interest in the described property to the Purchaser. Seller states and represents that as a condition of this transaction, Seller is the lawful owner of the described property, and that said property is free and clear of all claims, liens, and encumbrances and that Seller has title and the full power to sell, transfer, and deliver said property as provided herein.
>
> The Seller and/or the Designee named herein by the Seller is hereby granted the option by the Purchaser to repurchase the described property from the Purchaser at a mutually agreeable price. It is expressly understood that the Seller and/or his Designee has no obligation whatsoever to repurchase the described property. If any claim against the described property is made by any person or entity, the Seller agrees to assist the Purchaser in defending Seller's ability to transfer good title and agrees to pay all costs of defense of such title, including reasonable attorneys' fees and court costs. The Seller and his Designee may not transfer their right to repurchase the described property without the consent of the Purchaser. The Seller hereby states that the Seller and the Designee are over eighteen (18) years of age, and the Seller has read, understands and agrees to the terms of this contract.
>
> The Seller states that he/she understands that this is a transaction and not a loan. The seller also understands that no interest is being charged for this transaction.

> IF THE ABOVE STATED VERIFICATION IS PROVEN OTHERWISE, I
> PROMISE FULL RESTITUTION AND UNDERSTAND THAT I WILL BE
> CRIMINALLY PROSECUTED TO THE FULLEST EXTENT OF THE LAW.
>
> NOT RESPONSIBLE FOR LOSS OR DAMAGE TO PROPERTY
> DESCRIBED ABOVE, ARISING OUT OF FIRE, THEFT, RIOT OR ANY
> OTHER CASUALTY OR CAUSE.
>
> ALL TRANSACTIONS CONFIDENTIAL
> CASH ONLY ON ALL OPTION REPURCHASES.
> NO GOODS SENT C.O.D. • NO PERSONAL CHECKS ACCEPTED.
> NO GOODS SHOWN FOR REPURCHASE UNLESS PAID IN ADVANCE.
> VERBAL AGREEMENTS FOR ADDITIONAL DAYS ARE NOT BINDING.
> NOTICE: SEE REVERSE SIDE.

(Gilmore Dep. at 36 (Tab B), Ex. 2 (Tab D).)

The mechanics of the sale and repurchase agreements into which Ms. Gilmore entered with Pawn King are equally straightforward. Using the December 24, 2007 transaction as representative of those referenced in the Complaint (Gilmore Dep. at 30-31, 52-53 (Tab B), Ex. 2 (Tab D)), the "buy/sell agreement," as the name implies, contains two parts. First, Ms. Gilmore physically delivered three items to Pawn King, specifically, a bracelet, a pocket watch, and a lighter. (Gilmore Dep. at 42 (Tab B), Ex. 2 (Tab D).) In exchange, Ms. Gilmore received the agreed-upon sum of $1,500.00. (Gilmore Dep. at 43 (Tab B), Ex. 2 (Tab D).) Second, Ms. Gilmore secured a right to repurchase these three items within thirty (30) days for a price of $1,800.00. (Gilmore Dep. 43-44 (Tab B), Ex. 2 (Tab D).) This price reflects the original price paid by Pawn King ($1,500.00) plus a twenty percent (20%) monthly service charge, in this instance, $300.00. (Gilmore Dep. 43-44 (Tab B), Ex. 2 (Tab D).) Accordingly, Ms. Gilmore could have repurchased these three items on or before January 23, 2008 by paying Pawn King the sum of $1,800.00. (Gilmore Dep. 43-44 (Tab B), Ex. 2 (Tab D).) Ms. Gilmore understood this procedure given that she did in fact repurchase certain items. (Gilmore

6

Dep. at 43-44 (Tab B).)  Had she failed to do so, Ms. Gilmore would have lost the right to repurchase these items.  (Gilmore Dep. Ex. 2 (Tab D).)

After entering into the sale and repurchase agreements with Pawn King, Ms. Gilmore sent at least four letters to Mingione in July of 2008.  (Gilmore Dep. at 58-66 (Tab B), Ex. 3-6 (Tabs E-H)); Compl. Ex. N-Q.)  In these letters, which were ghostwritten by Douglas (Gilmore Dep. at 58-66 (Tab B)), Ms. Gilmore purported to complain about Pawn King's business practices, including the fees and property disposal practices that are the subject of this action.

Not long after Ms. Gilmore sent these letters to Mingione, she filed the instant action in which she asserted various claims all of which are predicated on the erroneous notion that these transactions unlawfully impose a usurious rate of interest.  In bringing and maintaining this action, Plaintiff contends that the sale and repurchase agreements are prohibited by Connecticut's usury statute governing pawnbrokers, even though this statute was amended in 1997 to make clear that such practices are legal.

While this case was pending, Douglas pressed his position with the Office of the Connecticut Attorney General soliciting its assistance in a series of letters sent in 2009.  (Gilmore Dep. at 67 (Tab B), Ex. 7 (Tab I)).  In the letters, Douglas failed to identify his "client" as being his own mother, instead referring to her simply as an "ill widow." (Gilmore Dep. at 68 (Tab B), Ex. 7 (Tab I).)  In addition, Douglas failed to disclose his history of accompanying his mother to pawn shops and then suing them.  (Gilmore Dep. Ex. 7 (Tab I).)  In any event, despite the barrage of letters, the Office of the Connecticut Attorney General has not attempted to intervene or appear in this action, of which the Court can take judicial notice.

Around the same time, Douglas contacted the Town Attorney for the Town of Stratford to levy threats of liability against the Town. (Gilmore Dep. at 75-76 (Tab B), Ex. 8 (Tab J).) In response, however, the Town Attorney stated that the Town "conducted a review of Pawn King and concluded that the operation of Pawn King appears to comply with the state law." (Gilmore Dep. at 79 (Tab B), Ex. 8 (Tab J).)

## LEGAL STANDARD

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure of the materials on file, and any affidavits show that there is no genuine issue of material fact. . . ." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where a moving party meets its initial burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party." Anderson, 477 U.S. at 255. "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

## ARGUMENT

### I. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNTS ONE THROUGH NINETEEN

Summary judgment is appropriate in this case because there is no genuine dispute as to the terms of the subject transactions and it is clear as a matter of law that the sale and repurchase agreements at issue were not illegal. Given that each of the

8

claims is predicated on wholly legal transactions, which have already been thoroughly scrutinized and found not to violate state usury laws by a judge of the Connecticut Superior Court, Defendants are entitled to judgment on Plaintiff's Complaint as a matter of law.

### A.   Defendants' Practices Do Not Violate State Usury Law

The thrust of Plaintiff's Complaint is that the subject transactions run afoul of Conn. Gen. Stat. § 21-44, Connecticut's usury statute governing pawnbrokers in the state. This alleged violation underpins all but one count of the Complaint, specifically the first nineteen counts. Plaintiff, however, misinterprets the applicable statute and fails to acknowledge a 1997 legislative amendment that significantly affected the manner in which pawnbrokers may do business in Connecticut. As a result, Plaintiff continues to rely on <u>Rhodes v. City of Hartford</u>, 201 Conn. 89 (1986), a case that has since been legislatively overruled.

#### 1.   The <u>Rhodes</u> case is inapplicable

The <u>Rhodes</u> case, which construed Conn. Gen. Stat. § 21-44 as it existed in 1986, assessed the statute's applicability to sale and repurchase agreements, the same type of transaction at issue in this case. At the time of the decision, and until October 1, 1997, the usury statute provided:

> [n]o pawnbroker or loan broker or person who loans money on the pledge of personal property shall take or receive, <u>directly or indirectly</u>, for the use of money loaned on personal property, any more than the following rates: For the use of money amounting to fifteen dollars or less, five per cent per month or fraction thereof; for the use of money exceeding fifteen dollars in amount and not exceeding fifty dollars in amount, three per cent per month or fraction thereof; for the use of money exceeding fifty dollars in amount, two per cent per month or fraction thereof.

Conn. Gen. Stat. § 21-44 (West 1997) (emphasis added).

9

In the Rhodes case, a Hartford pawnbroker sought a declaratory judgment concerning the applicability of Conn. Gen. Stat. § 21-44 to sale a repurchase agreements. Rhodes, 201 Conn. at 91. The pawnbroker argued that

> a pawnbroker's involvement in a repurchase transaction does not constitute the taking or receiving, directly or indirectly, of interest in return for the use of money he loans on the pledge of personal property. In support of his argument, he claim[ed] that the language of § 21-44 limits its application to loans. Because a repurchase transaction takes the form of a sale with an option to repurchase rather than the form of a loan, he contend[ed] that repurchase transactions are beyond the scope of §§ 21-44 and 21-45.

Rhodes, 201 Conn. at 95.

Focusing on the use of the word "indirectly," the Connecticut Supreme Court concluded that the statute did apply to such repurchase agreements. Rhodes, 201 Conn. at 96-7. In arriving at this conclusion, and in response to the above argument advanced by the pawnbroker, the Court observed that

> [t]his reasoning, however, fails] to take into account the fact that the statute expressly governs loans given in return for <u>indirect</u>, as well as direct, interest payments. By extending the statutes' coverage to transactions involving the <u>indirect</u> payment of interest, the legislature indicated that it intended the statutes to regulate not only those transactions that take the classic form of a conventional pawnbroking loan, but also financing arrangements that, in substance if not in form, amount to the economic equivalents of such a loan.

Rhodes, 201 Conn. at 95-6 (emphasis added).

While this decision on its face seems to support Plaintiff's claims, any reliance on the case is misplaced because it has since been legislatively overruled. See P.A. 97-164; see also Chin v. Mingione, Docket No. CV 02-0087522-S (Conn. Super. Dec. 2, 2003) (Pickard, J.) (discussing and acknowledging effect of P.A. 97-164 ) (a copy of Chin is attached hereto at Tab K). In 1997, the General Assembly overhauled Sections

10

21-39 through 21-47, which regulate pawnbrokers. Id. As part of this overhaul, the General Assembly deleted the words "directly or indirectly" from Conn. Gen. Stat. § 21-44. P.A. 97-164 § 5. Accordingly, Conn. Gen. Stat. § 21-44, as amended, currently provides that

> [n]o pawnbroker or person who loans money on the deposit or pledge of personal property shall take or receive, for the use of money loaned on personal property, any more than the following rates: For the use of money amounting to fifteen dollars or less, five per cent per month or fraction thereof; for the use of money exceeding fifteen dollars in amount and not exceeding fifty dollars in amount, three per cent per month or fraction thereof; for the use of money exceeding fifty dollars in amount, two per cent per month or fraction thereof.

Conn. Gen. Stat. § 21-44 (West 2010). The revised version of the statute excised the "indirectly" language relied upon by the Rhodes Court. It is this legislative amendment that undercuts Plaintiff's claims.

### 2. Defendants' practices have been held to be legal by the Connecticut Superior Court

The only court of which Defendants are aware to have analyzed this issue after the amendment has rejected the argument being advanced here by Plaintiff. See Chin v. Mingione, Docket No. CV 02-0087522-S (Conn. Super. Dec. 2, 2003) (Pickard, J.). In Chin, the plaintiff brought suit against Mingione to challenge the legality of the very same type of transaction at issue in the instant case. Chin at 4. The plaintiff claimed that Pawn King's sale and repurchase agreements violated Conn. Gen. Stat. § 21-44 in that they impose a rate of interest in excess of the two-percent (2%) maximum rate set forth therein. Id. Judge Pickard disagreed and issued a very thoughtful and cogent decision in which he concluded that Conn. Gen. Stat. § 21-44 did not govern Pawn King's sale and repurchase agreements. See Chin at 6-7.

As the basis for deciding that P.A. 97-164 affected the continuing applicability of Rhodes to sale and repurchase agreements, Judge Pickard aptly seized upon the Rhodes Court's emphasis and reliance upon the prior statute's reference to "indirect" interest. Chin at 3, 6. Judge Pickard noted that the Rhodes Court "recognized that the fees charged in a repurchase transaction are 'indirect' interest only." Chin at 6; see also Rhodes at 96 (recognizing that that the fee charged pursuant to a sale and repurchase agreement "constitutes the type of indirect interest envisaged by the drafters of § 21-44 . . . ."). Judge Pickard concluded that, "[s]ince the existing law was established by the Rhodes case based upon the presence of the word 'indirectly,' the elimination of this word must be presumed to change the result of Rhodes." Chin at 7. For this reason, Judge Pickard held that the rate limitation set forth in Conn. Gen. Stat. § 21-44 does not apply to sale and repurchase transactions.

### 3. This Court Should Follow The Holding Of Chin

Defendants urge this Court to adopt the persuasive reasoning of Judge Pickard in the Chin case. Because this case concerns the same type of transaction, specifically, a sale and repurchase transaction, the same result should follow in this case. The General Assembly, which is presumed to have been aware of the Rhodes decision and the interpretation of Conn. Gen. Stat. § 21-44 contained therein, see Mahon v. B.V. Unitron Mfg., Inc., 284 Conn. 645, 665 (2007), decided to amend Conn. Gen. Stat. § 21-44 to remove the reference to "indirect" interest. It is appropriate, therefore, to conclude that the General Assembly chose to eliminate the subject limitation with respect to sale and repurchase transactions.

The conclusion that Defendants' sale and repurchase transactions neither violate, nor even implicate, Conn. Gen. Stat. § 21-44, wholly undercuts each and every count that is predicated on a violation of the statute. Because Counts One through Nineteen all are predicated on a violation of Conn. Gen. Stat. § 21-44, Defendants are entitled to judgment as a matter of law.

## II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT TWENTY BASED ON LOCAL ORDINANCE

Count Twenty, which is the only claim based on an alleged violation of certain local ordinances contained in the Code of the Town of Stratford, is also without merit for at least two reasons. First, to the extent that Section 153-4 of the Code of the Town of Stratford purports to provide for a private right of action for violations of the pawnbroker ordinances, the ordinance is unenforceable because the General Assembly has not delegated to municipalities the power to create such a remedy.[3] Second, even assuming that the General Assembly has delegated such authority, the ordinances concerning pawnbrokers are still unenforceable because they are preempted by statute.

Plaintiff has alleged a violation of Section 153-3(E)(1), which provides, in pertinent part, that

> [n]o pawnbroker or loan broker or person who loans money on the pledge of personal property shall take or receive, <u>directly or indirectly</u>, for the use of money loaned on personal property, any more than the following rates:
>
> . . .
>
> (c) [f]or the use of money exceeding fifty dollars in amount: 2% per month or fraction thereof.

Code of the Town of Stratford, § 153-3(E)(1).

---

[3] Section 153-4 of the Code of the Town of Stratford provides that
> [a]ny person, corporation or partnership which engages in the business of a pawnbroker . . . which violates any of the provisions of this chapter . . . shall forfeit treble the amount loaned on the property so pledged to any person injured thereby who sues therefor.

13

Given the similarity between this provision and the pre-1997 version of Conn. Gen. Stat. § 21-44, it appears that the Town of Stratford simply adopted the version of the corresponding state statute as it then existed, but failed to amend its ordinance to conform to the amended version of Conn. Gen. Stat. § 21-44. In any event, as shown below, the local ordinances concerning pawnbrokers are unenforceable as part of a private cause of action.

### A. The Town of Stratford Does Not Have The Authority To Create A Private Right of Action

Section 153-4 of the Code of the Town of Stratford is unenforceable. Even though this section purports to create a private right of action for violations of the Town's ordinances concerning pawnbrokers, the Town does not have the power to promulgate such an ordinance. Municipalities, as creatures of the state, have no inherent powers of their own, and can only act within the scope of the powers and duties conferred by statute. Ghent v. Zoning Comm'n, 220 Conn. 584, 588 (1991). There is no statute, however, permitting municipalities to create private rights of action. As a result, the General Assembly has not delegated such authority and, therefore, the Town of Stratford's promulgation of Section 153-4 was ultra vires to the extent that it provides for such a private right. For this reason, Plaintiff's claim thereunder must fail and Defendants are consequently entitled to summary judgment on Count Twenty.

### B. The Local Ordinances Are Preempted By Statute

Even assuming that the Town of Stratford had the authority to create a private right of action for violations of the ordinances concerning pawnbrokers, these ordinances are unenforceable because they are preempted by state statute. "In determining whether a local ordinance is preempted by a state statute, [a court] must

14

consider whether the legislature has demonstrated an intent to occupy the entire field of regulation on the matter or whether the local ordinance irreconcilably conflicts with the statute." Modern Cigarette, Inc. v. Town of Orange, 256 Conn. 105, 119 (2001). In this case, the above local ordinance is preempted by statute because (1) the General Assembly has demonstrated an intent to occupy the entire field of regulation concerning pawnbrokers, and (2) the local ordinance purporting to establish a rate limitation on fees charged as part of a sale and repurchase agreement irreconcilably conflicts with Conn. Gen. Stat. § 21-44, as amended.

### 1. The General Assembly has demonstrated an intent to occupy the entire field concerning pawnbrokers

A review of the existing statutes governing this field demonstrates that the General Assembly has demonstrated an intent to occupy the entire field of regulation concerning pawnbrokers. The General Assembly has enacted various statutes concerning pawnbrokers. These statutes are compiled into a chapter dedicated to the regulation of pawnbrokers, specifically, Chapter 409. This multi-section chapter contains several statutes touching upon various aspects of pawnbroking, such as licensing and issuance thereof, record-keeping requirements, memorandum requirements, requirements concerning weekly reports, rates of interest, the sale or disposition of property, seizure by law enforcement officers, and penalties for violations of these provisions. See Conn. Gen. Stat. §§ 21-39 et seq.

Moreover, the General Assembly has expressly delegated powers to municipalities when it desired to share the regulation of certain fields. Although the General Assembly has expressly shared such powers with municipalities with respect to, for example, traffic and environmental protection, as well as the business of

15

peddlers, auctioneers, and junk dealers, the General Assembly did not do so with respect to pawnbrokers. See Conn. Gen. Stat. §§ 7-148(c)(7)(B)(i), 7-148(c)(7(H)(iv), 7-148(c)(8)(A). In addition, even when the General Assembly expressed an intent to share the regulation of a given field with municipalities, it provided that the municipalities exercise such power only in a manner that is not inconsistent with the general statute. Id.

The comprehensive nature of Chapter 409, coupled with the absence of any intent to share the regulation of this field with municipalities, demonstrates the General Assembly's intent to occupy the entire field of regulation concerning pawnbrokers. As a result, the local ordinances on which Plaintiff relies are preempted by Chapter 409. Because the ordinances are unenforceable, Defendants are entitled to judgment as a matter of law on Count Twenty.[4]

### 2. The local ordinances are in conflict with the state statute

Even assuming that the Court concludes that the General Assembly has not demonstrated an intent to occupy the entire field of regulation with respect to pawnbrokers, the local ordinances at issue are still preempted because they are in conflict with Chapter 409. In determining whether a conflict exists, a court should consider "whether the ordinance . . . prohibits that which the statute authorizes." Modern Cigarette, Inc., 256 Conn. at 120. In this case, the local ordinance purports to prohibit sale and purchase agreements involving fees in excess of two-percent (2%) per month. On the other hand, Conn. Gen. Stat. § 21-44, as amended, allows for such agreements. Because the local ordinance prohibits practices that are allowed by

---

[4] Even if the Court denies Defendants' motion for summary judgment with respect to Count Twenty, the Court should decline to exercise supplemental jurisdiction over this count.

16

statute, the ordinance is in conflict and, therefore, preempted. For this additional reason, the ordinances are unenforceable, and Defendants are consequently entitled to judgment as a matter of law on Count Twenty.

## CONCLUSION

For the foregoing reasons, Pawn King, Inc. and William V. Mingione request that their motion for summary judgment be granted in its entirety.

THE DEFENDANTS

By: ___/s/_____
Robert M. Frost, Jr. (ct19771)
Brian E. Tims (ct27962)

Zeldes, Needle & Cooper, P.C.
1000 Lafayette Boulevard
Bridgeport, CT 06604
(203) 333-9441 (Telephone)
(203) 333-1489 (Facsimile)
rfrost@znclaw.com (E-Mail)

Their Attorneys

## CERTIFICATION

I hereby certify that on this date a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

Dated at Bridgeport, Connecticut on this 10th day of January, 2011.

/s/
Brian E. Tims