UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DOUGLAS GILMORE, EXECUTOR OF THE    :
ESTATE OF BESS GILMORE,

     Plaintiff,                            :

VS.                                    : Civil Action No. 3:08cv01058 (SRU)

PAWN KING, INC. and               :
WILLIAM V. MINGIONE,

     Defendants.                 : November 6, 2014

AMENDED COMPLAINT

FIRST COUNT (Civil RICO Against Defendant Mingione)

    1.  The Plaintiff, Douglas Gilmore ("Gilmore"), the duly appointed executor of the

estate of his decedent, Bess Gilmore, late of Westport, Connecticut ("Mrs. Gilmore"),

resides at 11 Harding Lane, Westport, Connecticut.

    2.  Defendant Pawn King, Inc. ("Pawn King") is a Connecticut corporation having

its principal place of business at 2440 Barnum Avenue, Stratford, Connecticut.

    3.  Defendant William V. Mingione ("Mingione"), who is the President, a director

and the principal shareholder of Pawn King, resides at 474 Oakview Drive, Orange,

Connecticut.

    4.  This Court is vested with jurisdiction over the subject matter of this action

pursuant to 28 U.S.C. Sections 1331 and 1367(a), and 18 U.S.C. Section 1964(c).

5.  Venue is proper in this Court, pursuant to 28 U.S.C. Section 1391(b)(1) and (2), and 18 U.S.C. Section 1965(a).

6.  Mingione is associated in the operation of Pawn King with Walter Stens, his father-in-law, who is the corporate secretary, Cheryl C. Mingione, his wife, who is a director of the corporation, and, at any time, an average of three employees.

7.  At all relevant times, Pawn King has been in the business of lending money, directly or indirectly, to members of the public through transactions which it structures as "30-day buyback" or "repurchase" transactions, whereby it "purchases" personal property from a customer which the customer deposits with it on condition that the customer may "repurchase" the property from Pawn King within 30 days at a stipulated price consisting of repayment of the full amount of the "purchase price", plus interest at the rate of 20 percent of the "purchase price" per month, i.e., a rate of 240 percent per year.  If the customer does not "repurchase the property within the 30-day period, it forfeits the property to Pawn King.  The customer, however, may extend the initial 30-day time frame within which he or she may "repurchase" the property by an unlimited number of additional 30-day periods by paying Pawn King interest monthly at the rate of 20 percent of the "purchase price" per month, i.e., a rate of 240 percent per year.

8.  On or about October 15, 2005, Mrs. Gilmore entered into a transaction with Pawn King which was structured by Pawn King as a "30-day buyback" or "repurchase" transaction, by which she "sold" a Presidential 18-karat gold Parker Pen, having an estimated value of $10,000, for the sum of $400.00, which the Defendants paid her in cash (the "First Memorandum", a copy of which is annexed hereto as Exhibit A).

9.  On or about November 12, 2005, Mrs. Gilmore entered into a transaction with Pawn King which was structured by Pawn King as a "30-day buyback" or "repurchase" transaction, by which she "sold" a set of 18-karat gold cufflinks with $5 Indian head gold coins, having an estimate value of $5,000; a lady's Tanzanite diamond ring (Mrs. Gilmore's wedding ring) having an estimated value of $10,000; two gold pendants, having an estimate value of $2,000; and a 14-karat gold "Diamonds-by-the-Yard" necklace, having an estimated value of $8,000, for the aggregate sum of $700.00, which the Defendants paid her in cash (the "Second Memorandum", a copy of which is annexed hereto as Exhibit B).

10.  On or about December 23, 2005, Mrs. Gilmore entered into a transaction with Pawn King which was structured by Pawn King as a "30-day buyback" or "repurchase" transaction, by which she "sold" a set of gold and emerald cufflinks with a stickpin, having an estimated value of $7,000; a set of sapphire and gold cufflinks, having an estimated value of $3,000; and a set of American proof coins consisting of 87 $5-coins, 2 $50-coins, 8 silver dollars and 10 silver half-dollars, having an estimated value of $10,000, for the aggregate sum of $700.00, which the Defendants paid her in cash (the "Third Memorandum", a copy of which is annexed hereto as Exhibit C).

11.  On or about October 20, 2007, Mrs. Gilmore entered into a transaction with Pawn King which was structured by Pawn King as a "30-day buyback" or "repurchase" transaction, by which she "sold" a Patek Philippe 18-karat gold watch engraved with the name "John C. Gilmore" (Mrs. Gilmore's deceased husband), having an estimated value

3

of $20,000, for the sum of $1,500.00, which the Defendants paid her in cash (the "Fourth Memorandum", a copy of which is annexed hereto as Exhibit D).

12.   On or about December 24, 2007, Mrs. Gilmore entered into a transaction with Pawn King which was structured by Pawn King as a "30-day buyback" or "repurchase" transaction, by which she "sold" an 18-karat gold bracelet engraved with the name "John C. Gilmore" (Mrs. Gilmore's deceased husband), having an estimated value of $7,000; an 18-karat gold Tiffany Concord pocket watch with a chain and knife, having an estimated value of $4,000; a Cartier lighter having an estimated value of $1,000, for the aggregate sum of $1,500.00, which the Defendants paid her in cash (the "Fifth Memorandum", a copy of which is annexed hereto as Exhibit E).

13.   Pursuant to the terms of each of the five Memoranda issued by Pawn King to Mrs. Gilmore to document each of these "30-day buyback" or "repurchase" transactions, Mrs. Gilmore had the right to repurchase the items within 30 days by repaying the "purchase price" plus a charge of 20 percent of the "purchase price" per month, i.e., a rate of 240 percent per year.  In addition, Pawn King agreed to hold the items, and not sell or otherwise dispose of them, as long as Mrs. Gilmore continued to pay Pawn King the charges of 20 percent of the "purchase price" per month, i.e., a rate of 240 percent per year.

14.   Mrs. Gilmore made numerous monthly payments of the charges of 20 percent of the "purchase price" per month, i.e., a rate of 240 percent per year, with respect to each of the five Memoranda, each time receiving another Memorandum

documenting the payment and containing the same payment terms and conditions as the original Memorandum.

15.  Mrs. Gilmore did business with Pawn King not only during the period of 2005 - 2008, but for years prior to that, with the method of doing business always being the same.  At times, she would not make payments for several months, but Pawn King's course of conduct with her prior to on or about June 4, 2008 was not to sell or otherwise dispose of her property, even if she was late with, or skipped, monthly payments.

16.  On or about June 4, 2008, Pawn King, acting by its President, Mingione, demanded that Mrs. Gilmore make a payment of $720.00, being two months of monthly charges of 20 percent per month of the aggregate sum of $1,800.00 which she had received from Pawn King on the First, Second and Third Memoranda, under threat to the then-85-year-old widow, who was in frail health, that if she did not pay, her property covered by those Memoranda would be sold or otherwise disposed of.

17.  Frantic, in response to this demand, Mrs. Gilmore protested to Mingione that that was not her agreement with Pawn King and that her property could not be sold or otherwise disposed of.  Despite her protestation, Mingione insisted that she make the payment or her property would be sold or otherwise disposed of.  Mrs. Gilmore stated that she needed time to raise the funds, and that she would call Mingione to set a date for payment.  Mingione agreed, and promised her that Pawn King would not dispose of her property during the month of June 2008, and would take no action to sell or otherwise dispose of her property until he heard from her.

18.   On July 1, 2008, Mrs. Gilmore called Mingione to arrange a time to hand-deliver the funds, in cash, at Pawn King that week, but Mingione responded that Pawn King has already disposed of her property covered by the First, Second and Third Memorandum.  He had, in fact, disposed of all of the property covered by the Second Memorandum and the Third Memorandum, but not the First Memorandum.

19.   Mrs. Gilmore was so shocked and became so distraught upon being told this by Mingione, that she could not continue the telephone conversation.  She became ill and was unable to keep her appointment with her cardiologist the next morning.

20.   On July 2, 2008, Mrs. Gilmore, with the assistance of her son, the Plaintiff, faxed a letter to Mingione expressing her shock and advising him that the disposal of her property violated her agreement with Pawn King and "the law and state statutes", and demanded that Pawn King return the property it had disposed of.

21.   On July 3, 2008, Mrs. Gilmore, with the assistance of her son, the Plaintiff, faxed a letter to Mingione advising him and Pawn King of various violations of the law which Pawn King had committed, including the excessive charge of 20 percent of the "purchase price" per month, i.e., a rate of 240 percent per year, and warning him that Pawn King was subject to liability for treble damages, and that he and Pawn King were presumed to know the law.

22.   On July 5, 2008, the Defendants responded to Mrs. Gilmore by fax, demanding that Mrs. Gilmore bring all five Memoranda current by paying the accrued charges of 20 percent of the "purchase price" per month, i.e., a rate of 240 percent per

year, or Pawn King would dispose of all of her remaining property, advising her that paying those charges would cost her less than hiring an attorney.

23.   On July 5, 2008, Mrs. Gilmore, with the assistance of her son, the Plaintiff, responded to the Defendants by fax, adding to her previous comments that the Defendants' conduct was a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") for which Mingione could have civil liability for treble damages.

24.   On July 7, 2008, the Defendants responded to Mrs. Gilmore by fax, repeating the demand that she pay the accrued charges of 20 percent of the "purchase price" per month, i.e., a rate of 240 percent per year, or Pawn King would dispose of all of her property.

25.   On July 7, 2008, Mrs. Gilmore, with the assistance of her son, the Plaintiff, responded to the Defendants by fax, informing them that their conduct was unlawful.

26.   Pawn King has persisted in failing and refusing to return any of Mrs. Gilmore's property to her.

27.   During the years 2005 - 2008, as well as prior to and subsequent to that time frame, Pawn King regularly sold and continues to sell to a wholesale gold and jewelry dealer known to the Defendants as "George's Co." of 97-37 63d Road, Rego Park, New York, the gold, precious metals, diamonds and jewelry which it obtains from its customers, including Mrs. Gilmore, through pawns and "repurchase transactions." "George's Co." is a dealer with whom, according Mingione, most pawnbrokers in Connecticut do business for those purposes.  During the years 2005 - 2008, as well as

prior to and subsequent to that time frame, "George's Co." has come, and comes, to Pawn King every week or every other week and has purchased, and purchases, gold, precious metals, diamonds and jewelry from Pawn King, paying Pawn King cash.

28.  Pawn King is an "enterprise", within the meaning of 18 U.S.C. Section 1961(4), which by engaging in the conduct described in Paragraph 27 of the First Count, is engaged in, or its activities affect, interstate commerce, within the meaning of 18 U.S.C. Section 1962(b).

29.  Mingione is a "person" within the meaning of 18 U.S.C. Section 1961(3) who directly maintains an interest in or control of an "enterprise", namely, Pawn King, which is engaged in, or the activities of which affect, interstate commerce, within the meaning of 18 U.S.C. Section 1962(b).

30.  As a matter of law, as determined by the Connecticut Supreme Court in this case, Douglas Gilmore, Executor v. Pawn King, Inc., 313 Conn. 535, 98 A.3d 808 (2014),  the interest rate which may lawfully be charged by Pawn King to Mrs. Gilmore for the "repurchase transactions" memorialized in the five Memoranda is governed and limited by Connecticut's usury statute, C.G.S. Section 37-4, which makes it unlawful to "directly or indirectly, loan money to any person and, directly or indirectly, charge, demand, accept or make any agreement to receive therefor interest at a rate greater than twelve per cent per annum."  C.G.S. Section 37-7 makes it a crime for any person who, individually, or as an officer of any corporation, or as an agent of any corporation, violates any provision of C.G.S. Section 37-4.

31.  The interest rate of 20 percent per month - 240 percent per year - which Pawn King charged Mrs. Gilmore on the five Memoranda was 20 times the maximum interest rate permitted by C.G.S. Section 37-4.

32.  As the debt incurred by Mrs. Gilmore to Pawn King under the five Memoranda is unenforceable under the law of the State of Connecticut because of the laws relating to usury, and because that debt was incurred by Mrs. Gilmore in connection with Pawn King's business of lending money at a rate usurious under state law, where the usurious rate is at least twice the enforceable rate under state law, the debt incurred by Mrs. Gilmore to Pawn King is an "unlawful debt" within the meaning of 18 U.S.C. Section 1961(6).

33.  By directly or indirectly lending money to Mrs. Gilmore and directly or indirectly charging, demanding, accepting and making an agreement to receive therefor interest at the rate of 20 percent per month - 240 percent per year - Pawn King engaged in the "collection of an unlawful debt", in violation of 18 U.S.C. Section 1962.

34.  By engaging in the above-described conduct, Mingione violated 18 U.S.C. Section 1962(c), which provides, in relevant part, "It shall be unlawful for any person employed by or associated with any enterprise  engaged in, or the activities of which affect, interstate ... commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through ... [the] collection of unlawful debt", and is thereby liable to the Plaintiff, pursuant to 18 U.S.C. Section 1964(c), for threefold the damages which Mrs. Gilmore, the Plaintiff's decedent, sustained, and the cost of this suit, including a reasonable attorney's fee.

35.  Mrs. Gilmore, the Plaintiff's decedent, was injured in her property by reason of Pawn King's violation of 18 U.S.C. Section 1962(c).

<u>SECOND COUNT</u> (<u>Civil RICO Against Defendant Mingione</u>)

1 - 33.  Paragraphs 1 - 33 of the First Count are hereby made Paragraphs 1 - 33 of the Second Count.

34.  By engaging in the above-described conduct, Mingione violated 18 U.S.C. Section 1962(b), which provides, in relevant part, "It shall be unlawful for any person ... through collection of an unlawful debt to ... maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate ... commerce", and is thereby liable to the Plaintiff, pursuant to 18 U.S.C. Section 1964(c), for threefold the damages which Mrs. Gilmore, the Plaintiff's decedent, sustained, and the cost of this suit, including a reasonable attorney's fee.

35.  Mrs. Gilmore, the Plaintiff's decedent, was injured in her property by reason of Pawn King's violation of 18 U.S.C. Section 1962(b).

<u>THIRD COUNT</u> (<u>Connecticut Unfair Trade Practices Act Against Defendant Pawn King</u>)

1 - 33.  Paragraphs 1 - 33 of the First Count are hereby made Paragraphs 1 - 33 of the Third Count.

34.  Pawn King violated the Connecticut Unfair Trade Practices Act ("CUTPA"), C.G.S. Sections 42-110a <u>et</u> <u>seq</u>., in that its conduct constituted immoral, unethical and unscrupulous conduct which caused injury to the Plaintiff's decedent, Pawn King's consumer.

35.   The Plaintiff has suffered an ascertainable loss of money and property as a result of the conduct of Pawn King which is violative of CUTPA.

FOURTH COUNT (Conversion Against Defendant Pawn King)

1 - 33.   Paragraphs 1 - 33 of the First Count are hereby made Paragraphs 1 - 33 of the Fourth Count.

34.   The items of property which are the subjects of the five Memoranda belonged to the Plaintiff's decedent, Mrs. Gilmore.

35.   By its conduct, Pawn King deprived the Plaintiff's decedent of her property, which deprivation was unlawful and unauthorized by virtue of its being in violation of the Connecticut usury statute, C.G.S. Section 37-4.

36.   Pawn King's conduct caused the Plaintiff to suffer great financial harm.

FIFTH COUNT (Civil Theft Against Defendants Pawn King and Mingione)

1 - 33.   Paragraphs 1 - 33 of the First Count are hereby made Paragraphs 1 - 33 of the Fifth Count.

34.   The Defendants wrongfully and without authority, and with the intent to deprive the Plaintiff's decedent of her money and property, unlawfully obtained and took payments of interest from the Plaintiff's decedent at the rate of 20 percent per month - 240 percent per year - which was 20 times the maximum interest rate permitted by C.G.S. Section 37-4, sold or otherwise disposed of some of her property, and refused to return the remainder of her property to her despite her demand therefor, thereby depriving the Plaintiff's decedent of her money and property, in violation of C.G.S. Section 52-564.

SIXTH COUNT (Unjust Enrichment Against Defendant Pawn King)

1 - 33.  Paragraphs 1 - 33 of the First Count are hereby made Paragraphs 1 - 33 of the Sixth Count.

34.  Pawn King was benefitted at the expense of Mrs. Gilmore by charging her interest at the rate of 20 percent per month - 240 percent per year - which was 20 times the maximum interest rate permitted by C.G.S. Section 37-4, and by selling or otherwise disposing of some of her property and refusing to return to her, and wrongfully withholding from her, the remainder of her property.

35.  Pawn King has unjustly failed to pay the Plaintiff for that benefit and return Mrs. Gilmore's property to the Plaintiff, all to the Plaintiff's financial detriment.

36.  Pawn King has thereby been unjustly enriched at the expense of the Plaintiff.

SEVENTH COUNT (Violation of Local Ordinance Against Defendant Pawn King)

1 - 33.  Paragraphs 1 - 33 of the First Count are hereby made Paragraphs 1 - 33 of the Seventh Count.

34.  Pawn King is a pawnbroker, within the meaning of C.G.S. Section 21-39a(1), which defines "pawnbroker" as "a person who is engaged in the business of loaning money on the deposit or pledge of wearing apparel, jewelry, ornaments, household goods or other personal property or purchasing such property on condition of selling the same back again at a stipulated price."

35.  C.G.S. Section 21-39 prohibits a person in any city or town of the State of Connecticut from engaging in or carrying on the business of a pawnbroker unless such person is licensed in accordance with C.G.S. Section 21-40.

36.  C.G.S. Section 21-40, as it existed in the years 2005 - 2008, including the date on which this civil action was commenced, provided in relevant part, "The selectmen of any town and the chief of police of any city may grant licenses to suitable persons to be pawnbrokers and to carry on the business of lending money on the deposit or pledge of personal property, or of purchasing such property on condition of selling it back again at a stipulated price ...."

37.  Stratford, Connecticut is a town, not a city.

38.  C.G.S. Section 21-47(a), as it existed in the years 2005 - 2008, including the date on which this civil action was commenced, provided, in relevant part, "Any ... corporation ... which engages in the business of a pawnbroker, ... unless licensed according to law ... shall forfeit treble the amount loaned on the property so pledged to any person injured thereby who sues therefor."

39.  During the years 2005 - 2008, Pawn King's pawnbroker's license was issued by the Chief of Police of the Town of Stratford, who was not the authorized licensing authority for the town under C.G.S. Section 21-40.

40.  During the years 2005 - 2008, Pawn King's license was therefore not licensed according to law, and therefore must forfeit to the Plaintiff treble the amount loaned on the property to Mrs. Gilmore.

EIGHT COUNT (Intentional Infliction of Emotional Distress Against Defendants Pawn
              King and Mingione)

1 - 26.  Paragraphs 1 - 26 of the First Count are hereby made Paragraphs 1 - 26 of the Eighth Count.

27.  The Defendants, having known and done business with Mrs. Gilmore for a period of years, knew or should have known that she was elderly widow and in frail health.

28.  By threatening Mrs. Gilmore that they would sell or otherwise dispose of her property, including her wedding ring, if she did not quickly pay the accrued usurious interest charged by Pawn King, and by making good on that threat before the expiration of the time in which they agreed she could make a payment to prevent the loss and disposal of her property, the Defendants intended to inflict emotional distress on Mrs. Gilmore, or knew or should have known that emotional distress on the part of Mrs. Gilmore was the likely result of their conduct.

29.  The Defendants' conduct in placing tremendous emotional and financial pressure on an elderly, frail widow to come up with a payment, on short notice, of prohibited and criminally usurious interest charges which were 20 times the rate permitted by law, was extreme and outrageous.

30.  The Defendants' conduct caused Mrs. Gilmore emotional distress.

31.  Mrs. Gilmore's emotional distress was severe.

WHEREFORE, the Plaintiff claims:

1.  money damages, both compensatory and, with respect to the claim for intentional infliction of emotional distress, non-economic damages;

2.  treble damages, pursuant to 18 U.S.C. Section 1964(c);

3.  a reasonable attorney's fee, pursuant to 18 U.S.C. Section 1964(c);

4.  an order that Mingione disgorge to the Plaintiff any ill-gotten gains, i.e., any profits or other distribution of proceeds which he received or derived, or may receive or derive, directly or indirectly, as a shareholder, director or employee of Pawn King or otherwise, from the unlawful conduct of, or participation in the affairs of the RICO enterprise, Pawn King, as that conduct relates to Pawn King's transactions with the Plaintiff, pursuant to 18 U.S.C. Section 1964(a);

5.  punitive damages, pursuant to C.G.S. Section 42-110g(a);

6.  a reasonable attorney's fee, pursuant to C.G.S. Section 42-110g(d);

7.  treble damages for civil theft, pursuant to C.G.S. Section 52-564;

8.  treble the amount loaned, pursuant to C.G.S. Section 21-47(a);

9.  the return of the Plaintiff's property still in the possession of Pawn King;

10.  common law punitive damages, with respect to the claim for intentional infliction of emotional distress, in the form of attorney's fees;

11.  prejudgment and postjudgment interest at the rate of 10 percent per annum, pursuant to C.G.S. Section 37-3a;

12.  the costs of this action, pursuant to 18 U.S.C., Section 1964(c) or as otherwise provided for at law or in equity;

13.   such other and further relief to which the Plaintiff may be entitled at law or in equity.

The Plaintiff, DOUGLAS GILMORE,
EXECUTOR OF THE ESTATE OF
BESS GILMORE


By:  /s/_ Jonathan J. Klein
     Jonathan J. Klein (ct00513)
     1445 Capitol Avenue
     Bridgeport, Connecticut  06604-1619
     Phone:  (203) 330-1900
     Fax:  (203) 330-1526
     E-mail:  jjkesq@hotmail.com


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 6, 2014, a copy of the foregoing Amended Complaint was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

/s/_ Jonathan J. Klein
Jonathan J. Klein

# EXHIBIT A



2440 BARN... STRATFORD, CT 06615
(203) 375-4228

BESS GILMORE
11 HARDING LA
WESTPORT, CT.

ID# 011331177
ID  CT DL
Ht  5-02    Wt  150
HPh (203)-227-0854
Did on 10-130 at 16:40
bargain sell % delivered
the following property.

DOB 01-29-23
Sx F
Hy GRY     Ey GRN

| Item # | Brand | Description | Amount |
|---|---|---|---|
| 005509423 | PARKER | PARKER PRESIDENTIAL PEN 18K GOLD NINE YES | 400.00 |

05-08-07

30-DAY BUYBACK

SERVICE CHARGE   80.00

400.00

480.00    240%

20%

YEAR   MONTH

PAWNNING
(Purchaser)

X _____
(Customer Sign)

I THE UNDERSIGNED, HAVE CAREFULLY READ THE TERMS AND CONDITIONS ON THE FRONT AND BACK OF THIS AGREEMENT AND AGREE TO THEM

EXPIRES ON 05-08-07
TRANSFERED FOR RESALE AT EXPERATION

# EXHIBIT B



# EXHIBIT C



# EXHIBIT D



# EXHIBIT E

