# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DOUGLASS GILMORE, EXECUTOR OF
THE ESTATE OF BESS GILMORE,
        Plaintiff,

        v.

PAWN KING, INC., WILLIAM V.
MINGIONE,
        Defendants.

No. 3:08-cv-1058 (SRU)

## RULING AND ORDER

This case arises out of a series of pawn transactions between Bess Gilmore ("B.
Gilmore") and defendant Pawn King, Inc.  Douglass Gilmore ("D. Gilmore" or "Gilmore"), in
his capacity as executor of B. Gilmore's estate, alleged that Pawn King and its sole proprietor,
William V. Mingione, violated various federal and state laws by charging Gilmore a usurious
rate of interest on the loan that they had given her.  Further, D. Gilmore alleged that Pawn King
improperly disposed of B. Gilmore's personal property items when she refused to meet its
demands for payment.  D. Gilmore alleged that such conduct caused B. Gilmore actual and
emotional harm.[1]

On May 14, 2015, I granted in part and denied in part Gilmore's motion for summary
judgment (doc. # 128).  *See* Memorandum of Decision (doc. # 136).  I granted summary
judgment in favor of Gilmore and against Mingione on Count I (RICO, section 1962(c)).  I also
granted summary judgment in favor of Gilmore and against Pawn King on Count III (CUTPA),

---

[1] Plaintiff alleged two separate violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18
U.S.C. § 1962(c) (Count I) and § 1962(b) (Count II), a violation of the Connecticut Unfair Trade Practices Act
("CUTPA"), Conn. Gen. Stat. § 42-110a, *et seq.* (Count III), a common law conversion claim (Count IV), statutory
theft in violation of Conn. Gen. Stat. § 52-564 (Count V), a common law unjust enrichment claim (Count VI), a
violation of Conn. Gen. Stat. § 21-47(a) (Count VII), and a common law intentional infliction of emotional distress
claim (Count VIII).

Count IV (Conversion), and Count VI (Unjust Enrichment).  I granted summary judgment in favor of the defendants on all other counts (except the defendants' counterclaim, on which I granted summary judgment in favor of Gilmore).

Beginning on December 16, 2015, I conducted a three-day hearing to determine the amount owed to plaintiff as a result of Mingione's liability under civil RICO and Pawn King's liability under the remaining state law claims.  My findings of fact and conclusions of law related to the December 2015 hearing are as follows.

I.      **Background**

Between October 2005 and December 2007, B. Gilmore entered into five so-called "repurchase" transactions with Pawn King.  For each transaction, B. Gilmore would provide Pawn King with personal property items in exchange for a sum of money.  Under the terms of the parties' agreement, B. Gilmore was given the opportunity to "repurchase" those items by paying Pawn King the principal amount of money that she had received along with the accumulated interest, which grew at a rate of twenty percent per month (240 percent per annum). For all intents and purposes, the transaction amounted to a loan in which B. Gilmore's personal property was offered as collateral.

The parties do not dispute that, during the course of their transactions, from October 2005 until July 2008, B. Gilmore made $2,720 in interest payments to Pawn King.  During that same period B. Gilmore received $4,800 from Pawn King in return for the items that she had given to Pawn King in the form of the "repurchase" transactions.

On July 2, 2008, B. Gilmore faxed defendants a letter in which she informed Pawn King of the potential illegality of its actions and requested that Pawn King return all of her property. The next day, Mingione responded via fax stating that the property that she requested had

already been disposed of based on business exigencies.   In the ensuing days, the parties

exchanged further communications in which B. Gilmore demanded the return of her items and

Mingione demanded payment.  On July 15, 2008, B. Gilmore commenced suit in federal court,

alleging claims under civil RICO and state law.

On May 14, 2015, I granted summary judgment in favor of Gilmore on Count I (RICO,

section 1962(c)), Count III (CUTPA), Count IV (Conversion), and Count VI (Unjust

Enrichment).  Beginning on December 16, 2015, I conducted a three-day hearing to determine

the amount of damages due to Gilmore.

## II.    Discussion

As a result of the hearing, I have identified five disputed issues: (1) whether, under 18

U.S.C. § 1962(c), Gilmore is entitled to receive a trebling of all the damages claimed in the suit

or solely those incurred as a direct result of the RICO violation; (2) whether Mingione is entitled

to a set-off for the amount of money that he provided to B. Gilmore from 2005 to 2008, and

whether the set-off should be applied before or after the trebling of damages under RICO; (3)

whether the damages for the conversion claim include the value of the items returned to and

currently in the possession of D. Gilmore; (4) the value of the items subject to the conversion

claim; and (5) whether, under CUTPA, Gilmore is entitled to punitive damages.  The parties

agree that Gilmore is entitled to reasonable attorneys' fees and costs under either civil RICO or

CUTPA, but not both.

### A.  Damages will only be trebled insofar as they directly flow from the RICO violation

RICO provides that any person injured as a result of a violation of section 1962 may

recover treble damages, costs, and reasonable attorneys' fees.  18 U.S.C. § 1964(c).  In order to

recover damages under section 1964(c), a plaintiff must prove that the defendant's violation of

3

section 1962 actually caused plaintiff's injury.  *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 380 (2d Cir. 2001).  A plaintiff cannot establish that his or her damages are "by reason of" the RICO violation unless there is proof that the violation "was the legal, or proximate, cause of [plaintiff's] injury, as well as a logical, or but for cause."  *Id.* (citing *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268-69 (1992)) (internal quotation marks omitted).  But-for causation alone is insufficient.  *Id.*

Proximate causation will be found if the acts that constitute the RICO violation "are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence."  *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23-24 (2d Cir. 1990).  Because it is plaintiff's burden to prove causation, it is plaintiff's responsibility to prove that the RICO violation was a substantial factor in causing the loss, not simply that it could have contributed to the claimed loss.  *Kesick v. Ulloa*, 2012 WL 2873364, at *9 (N.D.N.Y. July 12, 2012).

In *Kesick v. Ulloa*, the court held that a plaintiff had failed to present evidence that she was damaged as a result of false liens that were filed against her property.  *See* 2012 WL 2873364, at *9.  Though the filing of false liens was a RICO violation, plaintiff failed to show how she had been harmed by such conduct.  The court held so, notwithstanding the fact that defendant's conduct had damaged her creditworthiness, which in turn could have harmed her business or property interests.  *See id.*  The plaintiff was unable to collect damages as a result of her diminished creditworthiness because she failed to present any evidence of damages to her business or property interests.  *See id.*  If a plaintiff cannot tie certain claimed damages to the RICO violation, trebling of such damages would be in violation of RICO's causation requirement.

Count I, the sole RICO claim to survive summary judgment, alleges that Mingione violated section 1962(c) when he attempted to collect an unlawful debt in the form of usurious interest charges.  *See* Memorandum of Decision (doc. # 136).  The damages incurred by Gilmore as a result of Mingione's section 1962(c) violation are the amounts that B. Gilmore paid as a result of Mingione's attempts to collect an unlawful debt.

The parties do not dispute that B. Gilmore paid $2,720 in interest payments, which have since been determined to be unlawful.  Though Gilmore also alleges emotional harm caused by the usurious rate of interest, such harm is not a cognizable injury under civil RICO.  *See Angermeir v. Cohen,* 14 F. Supp. 3d 134, 152 (S.D.N.Y. 2014).  Accordingly, the amount of RICO damages to be trebled is the amount of interest that B. Gilmore paid.[2]  Trebling $2,720 amounts to total RICO damages of $8,160, along with applicable attorneys' fees and costs of the suit.[3]

Gilmore has not established that he is entitled to the trebling of the damages resulting from Pawn King's conversion of personal property (Count IV).  Though it is true that Pawn King would not have had the opportunity to convert B. Gilmore's property if she had not entered into unlawful "repurchase" transactions with Mingione, Gilmore has failed to establish that the conversion was proximately caused by the usurious interest rate.

RICO's treble damages provision is a powerful weapon; "[t]he court must therefore review plaintiffs' civil RICO allegations with particular scrutiny."  *Chubb & Son Inc. v. Kelleher*, 2006 WL 1789118, at *2 (E.D.N.Y. Mar. 28, 2006).  Courts must endeavor to avoid

---

[2] To the extent that defendants claim they should only be required to pay the amount of interest in excess of the lawful rate, that claim lacks merit.  *See Equity Mortgage, Inc. v. Niro*, 44 Conn. App. 471, 476 (1997) (lender cannot collect any amount of interest on a usurious loan); *In re Lico Mfg. Co.*, 201 F. Supp. 899, 903 (D. Conn. 1961), *aff'd sub nom. Cohn v. Lico Mfg. Co.*, 323 F.2d 871 (2d Cir. 1963) (lender cannot collect on a usurious loan).
[3] Unlike RICO compensatory damages, attorneys' fees incurred in the RICO lawsuit are not trebled.  *Cf. Loop Prod. v. Capital Connections LLC*, 797 F. Supp. 2d 338, 353 (S.D.N.Y. 2011) (trebled attorneys' fees and costs not awarded).  Gilmore has not proven that any portion of the claimed attorneys' fees or costs were incurred as damages before this lawsuit was filed.

the risk that "actions traditionally brought in state courts do not gain access to treble damages and attorneys['] fees in federal court simply because they are cast in terms of RICO violations." *Id.*

Gilmore adequately established that B. Gilmore entered into "repurchase" transactions and Mingione violated RICO by collecting interest payments that were charged at a usurious rate.  However, she did not establish any facts indicating that the collection of that interest was the proximate cause of her loss due to conversion.  Specifically, there was no proof that B. Gilmore was willing to tender the principal amount of the loan in exchange for a return of her goods.  The fact that she demanded her goods by means of a demand letter is insufficient to establish that the usurious interest rate caused her to lose her property.  At the time B. Gilmore demanded the goods back, she had still not tendered an amount equal to the principal on the loan, nor had she offered to do so.

Had Gilmore established that, as a result of the illegal interest payments, B. Gilmore could no longer afford to buy back her items, Gilmore might be able to establish that the RICO violation was the proximate cause of the loss of her property.  Though it is possible that B. Gilmore would have been able to recover the items if she had not been charged a usurious rate of interest, Gilmore failed to present any evidence that she would have been able to or would have elected to do so.  Without such proof, Gilmore is unable to establish that the conversion, though clearly unlawful, was proximately caused by the RICO violation.  Accordingly, Gilmore may not use RICO's treble damages provision to treble the damages resulting from the conversion of B. Gilmore's personal property.

   B.  <u>After RICO damages are calculated, Mingione is entitled to set-off the amount of money
       that he provided B. Gilmore in connection with the "repurchase" transactions</u>

        I have found no authority on the question whether a plaintiff is entitled to damages under

RICO based on the collection of an unlawful debt when the plaintiff received more in loan

principal than she paid in unlawful interest payments.  I need not address the issue in this case

because RICO's treble damages provision requires that any set-off be applied after the damages

had been trebled.  *State Farm Mut. Auto. Ins. Co. v. Kalika*, 2007 WL 4326920, at *9 (E.D.N.Y.

Dec. 7, 2007) (recognizing that, though Second Circuit has not yet ruled on the issue, other

circuits have held that set-off occurs after RICO damages are trebled).  Accordingly, when a

defendant puts forth a claim of set-off as an affirmative defense to damages under RICO, the

court must first treble the RICO damages and then set-off the amount claimed by the defendant.

*See id.*; *see also City of New York v. Pollock*, 2006 WL 522462, at *17 (S.D.N.Y. Mar. 3, 2006).

        In the instant action, Mingione asserts that any damages should be set-off by an amount

of $4,800, which represents the amount of cash that he tendered to B. Gilmore in connection

with the "repurchase" transactions.  *See* Defs.' Answer to Amended Complaint at 9 (doc. # 125).

Gilmore does not dispute that this amount should be set off, but asserts that it should be set off

after the trebling of the RICO damages.  Because I agree that prevailing case law instructs a

court to set off damages after trebling, I will set off the $4,800 from the $8,160, which represents

the trebled amount of unlawfully collected interest payments.  Thus, the total damages for Count

I (RICO) amounts to a net of $3,360, plus attorneys' fees and allowable costs.

        Following the hearing on damages, counsel for Gilmore submitted an Affidavit of

Attorney's Fees (doc. # 149).  The Affidavit of Attorney's Fees attests that Attorney Klein

charged a rate of $250.00 per hour and billed a total of 267.8 hours during the course of his

representation of Gilmore, totaling $66,950 in attorneys' fees.  Because I find those fees

reasonable, I award Gilmore attorneys' fees in that amount.  As a result of Count I (RICO),

Gilmore is awarded $70,310, plus allowable costs.  As the sole defendant in Count I, Mingione is

liable for the full amount.[4]

C.  Gilmore's Conversion claim only entitles him to damages caused by the resale of B.
    Gilmore's personal property without her authority

A defendant is only liable for conversion of items that the defendant "without

authorization, assumes and exercises ownership over . . . to the exclusion of the owner's rights."

*Deming v. Nationwide Mut. Ins. Co.*, 279 Conn. 745, 770 (2006).  The defendant's actions must

deprive the true owner of the property "permanently or for an indefinite time." *Id.*  A defendant

will not be liable for conversion merely because the plaintiff has established that the defendant

exercised control over the items in an unauthorized manner.  *See Kopperl v. Bain*, 23 F. Supp. 3d

97, 103 (D. Conn. 2014).  Rather, a plaintiff must show that the items at issue were "converted"

to the defendant's own use.  *Id.*

The measure of damages in a conversion action is "the value of the goods at the date of

the conversion."  *Waterbury Petroleum Products, Inc. v. Canaan Oil & Fuel Co.*, 193 Conn. 208,

222 (1984) (internal quotation marks and citations omitted).  A plaintiff may also recover interest

on the property subject to the conversion claim if the court determines that it is the award is

consistent with the "demands of justice."  *See Wells Laundry & Linen Supply Co. v. ACME Fast

Freight*, 138 Conn. 458, 463 (1952); *see also Cadle Co. v. Fletcher*, 2014 WL 3962469, at *3

(D. Conn. Aug. 13, 2014).

In the instant case, Gilmore argues that Pawn King is liable for the conversion of all of

the personal property that B. Gilmore entrusted to Pawn King in the various "repurchase"

---

[4] Though it will be discussed later, I should note that Pawn King is also liable, on the basis of its CUTPA violation, for the full amount of reasonable attorneys' fees and costs incurred by Gilmore.  Accordingly, the defendants are jointly and severally liable for Gilmore's reasonable attorneys' fees, amounting to $66,950, plus allowable costs.

transactions.  Gilmore's claim for damages includes the value of property that was returned to B. Gilmore's estate in May 2015, after I granted Gilmore's motion for summary judgment on the conversion claim.

Gilmore has put forward no evidence of any damages that B. Gilmore suffered as a result of the unauthorized control over the personal property items that were later returned to her estate. Those items consist of an engraved Tiffany & Co. ("Tiffany's") bracelet, a Tiffany's pocket watch, a Parker Presidential pen, a gold Cartier lighter, and a Patek Philippe wristwatch. Gilmore does not allege consequential damages resulting from the inability to access such items. For example, no evidence indicates that, as a result of the property deprivation, B. Gilmore had to expend money to purchase replacements for these items.  Nor does Gilmore allege, much less establish, that the items possessed any value in B. Gilmore's everyday life—value that was lost as a result of the deprivation.

Finally, there is no proof that Pawn King converted the returned property to its own use. Mingione testified that the property just sat in one of the various vaults of Pawn King.  After my ruling in May 2015, once it became apparent that Pawn King was holding the property unlawfully, Pawn King promptly returned it.  Without any proof that Pawn King permanently retained the returned property or converted that property to its own use, Gilmore cannot establish a claim for damages of such property.

Of course, Gilmore is entitled to damages for the conversion of personal property that was disposed of by Pawn King.  Mingione testified that in July 2008, he sold seven items of B. Gilmore's property in exchange for "scrap value" of the goods.  The act of selling her property converted such property to Pawn King's own use at the moment of the sale.  Accordingly,

Gilmore is entitled to damages amounting to the market value of the sold items at the time of Pawn King's sale of that property, plus interest.

D. Factual findings regarding the value of the sold items

The primary subject of the damages hearing was to determine the value of the goods subject to the conversion claim.[5]  Because I hold that Gilmore may only seek money damages in relation to the personal property items that Pawn King sold, I will only make factual findings regarding the value of the sold items.

At the outset, it is important to recognize that, because Pawn King "produced the damage, [they] must bear the uncertainty of proof."  *Perma Research & Dev. v. Singer Co.*, 542 F.2d 111, 116 (2d Cir. 1976).  That being said, though it is often impossible to achieve mathematical certainty with respect to the measure of damages, it is plaintiff's burden to "provide sufficient evidence for the trier of fact to make a fair and reasonable estimate."  *Ulbrich v. Groth*, 310 Conn. 375, 441 (2013).

The difficulty in this case lies in the fact that the sold goods were just that—sold, and no longer available for inspection.  In an attempt to overcome that obstacle, B. Gilmore's son and executor of her estate, D. Gilmore, provided testimony regarding the items—jewelry and collectible coins—B. Gilmore had pawned to Pawn King.  D. Gilmore used a combination of pawn tickets, personal notes, photographs, gift receipts, prior appraisals, and his own personal recollection in order to determine the identity of the items that had been sold.  D. Gilmore

---

[5] Damages arising out of Gilmore's CUTPA and unjust enrichment claims are also measured by the value of the goods that were converted by defendants.  However, the parties acknowledge that Gilmore is not entitled to duplicative damages arising from the disposal of the property.  Because the CUTPA and unjust enrichment claims are consistent with the damages Gilmore is entitled to receive under the conversion claim, I will limit my discussion to the conversion damages.  Though I do not go into a separate discussion of CUTPA damages, Pawn King remains liable for Gilmore's attorneys' fees and costs as a result of its CUTPA violation.  Accordingly, Mingione is liable for reasonable attorneys' fees and costs arising out of Count I, and Pawn King is liable for reasonable attorneys' fees and costs arising out of Count III.  Though the parties are jointly and severally liable for attorneys' fees and costs, Gilmore may not achieve double recovery by collecting the full amount from both defendants.

testified that he was personally involved in the pawn transactions executed by his mother and that he was intimately familiar with the items at issue.  Through his testimony, Gilmore was able to establish which items were given to Pawn King, which were returned, and which the defendants' had sold as scrap metal.  Once Gilmore established the specific items he believed were sold, he used expert testimony to determine the value of such goods at the time of the conversion.

Neil H. Cohen, a member of the American Society of Appraisers, testified to the value of the jewelry at issue.  Paul Montgomery, a professional numismatist and appraiser, submitted a sworn declaration regarding the value of the collectible coins that were allegedly provided to Pawn King and later sold.  The parties do not dispute the validity of the expert opinions and the values that were ascribed to the jewelry and coins at issue.  The main disputed issues are the make and physical properties of the jewelry and the quantity of collectible coins that B. Gilmore provided to Pawn King.  I will address the disputed issues, item by item.

### 1.  *18-Karat Gold "Diamonds by the Yard" Necklace*

D. Gilmore testified that one of the items that his mother pawned was an 18-karat, so-called "Diamonds by the Yard" necklace.  Through his testimony, the item was described as a gold chain with diamonds in it.  True to its name, the necklace was approximate one yard long. D. Gilmore testified that the necklace was made by Tiffany's and sold to his mother, B. Gilmore, in 1975.  In an effort to aid Cohen's appraisal of the item, D. Gilmore provided the original purchase receipt, which indicated that B. Gilmore purchased the item from Tiffany's in 1975. Though none of the pawn tickets identifies any item specifically as a "Diamonds by the Yard" necklace, the November 12, 2005 pawn ticket listed a 14-karat, thirty-inch necklace.  Pl.'s Ex. 1. D. Gilmore testified that this annotation reflects B. Gilmore's pawning of the "Diamonds by the

11

Yard" necklace because he remembers his mother pawning the item and his mother did not possess any other similar jewelry.

Defendants argue that the thirty-inch necklace that Pawn King received from B. Gilmore and later sold was not made by Tiffany's. Had it been made by Tiffany's, Mingione testified that it would not have been sold as scrap. As the parties agree, Tiffany's items are worth a premium of at least twice, if not two-and-a-half times the market rate of the precious stones and metals of which they consist. Mingione testified that he never would have sold such a precious item for scrap value. Furthermore, Mingione testified that he would have written "Tiffany's" on the pawn ticket had the item actually been from Tiffany's.

I find that the "Diamonds by the Yard" necklace that D. Gilmore testified to being pawned by his mother is the very same one that Cohen valued at $8,000. D. Gilmore possessed great knowledge regarding his mother's jewelry and it was clear that he expressed an interest in such items prior to the date that they were pawned. D. Gilmore also testified that his mother had an account at Tiffany's and preferred to buy her jewelry there. That, along with the fact that D. Gilmore was able to provide a Tiffany's purchase receipt to Cohen, made D. Gilmore's testimony credible and established that the pawned item was a Tiffany's "Diamonds by the Yard" necklace.

Mingione's testimony, though not incredible, was not sufficient to overcome the proof that Gilmore provided. The fact that the pawn ticket did not list the item as coming from Tiffany's does not weigh heavily in favor of proof that the item was generic. After all, Pawn King did not have an incentive to highlight the value of items that it was receiving in pawn. Doing so would increase the amount of money that a customer would be able to request in exchange for the item. Evidence of such a practice can be found on the December 24, 2007

12

pawn ticket memorandum, where the ticket identifies an 18-karat gold bracelet, engraved with the name John C. Gilmore.  That bracelet was one of the items returned to B. Gilmore's estate and the parties do not contest the fact that it is from Tiffany's.  However, the December 24, 2007, pawn ticket makes no indication that the bracelet is from Tiffany's.  This conspicuous absence strengthens my conclusion that I should not put much weight on omissions from the pawn tickets' description of the goods.

Mingione's assertion that he would not sell a Tiffany's item as scrap similarly does not alter my conclusion.  Mingione testified that he sold items in bulk and did not itemize the items that he was selling as scrap.  It is quite conceivable that Mingione did not want to sell a Tiffany's necklace for scrap value, but did so by inadvertence.  Furthermore, Mingione's testimony does not conclusively establish that he did not dispose of that particular necklace by alternative means.  Accordingly, I find that Gilmore is entitled to $8,000 in damages for the conversion of her "Diamonds by the Yard" necklace.

2.  *14-Karat Gold and Emerald Cufflinks with Matching Stickpin*

The next item that D. Gilmore testified about was his mother's 14-karat gold and emerald cufflinks and matching stickpin.  D. Gilmore testified that, in order to help identify the emerald cufflinks and stickpin, he provided Cohen with a 1980 appraisal of the items from Playhouse Jewelers.  Playhouse Jewelers was a local business where Gilmore's father would routinely go to get B. Gilmore's jewelry appraised for insurance purposes.  The appraisal, provided to the court as an addendum to Cohen's expert report, identifies 14-karat gold cufflinks and a matching stickpin.  Pl.'s Ex. 4.  According to the appraisal, each cufflink had six emerald stones in it.  That description matches Gilmore's photographs of the cufflinks.  *See* Pl.'s Ex. 10A.  Moreover, the description matches the December 23, 2005, pawn ticket description of cufflinks and a stickpin

that were sold to Pawn King by B. Gilmore.  Pl.'s Ex. 1.  Though the pawn ticket does not say that the cufflinks contained emerald stones, it does mention that it contained something that was "RND" and "GRN," which can be taken to describe the round green emeralds seen in Gilmore's photograph and mentioned in the Playhouse Jewelers' appraisal.

Once again, defendants contend that the cufflinks and stickpin are not, as D. Gilmore contends, from Tiffany's.  For the reasons already stated, I do not find Mingione's testimony persuasive.  D. Gilmore maintained a conviction that certain items were from Tiffany's and I find that to be true, based on his knowledge of his mother's jewelry and her history of purchasing items from Tiffany's.

Based on D. Gilmore's testimony and on the similarity among the photograph, the Playhouse Jewelers' appraisal, and the pawn ticket, I find that the cufflinks at issue are the ones that D. Gilmore purports them to be.  Accordingly, I adopt Cohen's valuation of the cufflinks and matching stickpin and award Gilmore $8,825 in damages for their conversion.

3.  *14-Karat Gold Cufflinks with Florentine Finish*

The facts regarding the cufflinks with Florentine finish are substantially the same as the emerald cufflinks.  Through D. Gilmore's own recollection, the Playhouse Jewelers' appraisal, and the corresponding December 23, 2005 pawn ticket, I find that the cufflinks with Florentine finish are those that D. Gilmore purports them to be.  Like the emerald cufflinks, the Playhouse Jewelers' appraisal and the pawn ticket describe them in a similar manner.  Both note that they are 14-karat gold, round, and contain blue stones in the middle.  A photograph of the cufflinks further corroborates that the pawn ticket and Playhouse Jewelers' appraisal were referring to the same item.  Though the pawn ticket does not identify the blue stones as sapphires, the common description of the items, along with other corroborating evidence, makes it clear that the

cufflinks are the same.  For those reasons, I adopt Cohen's valuation of the cufflinks with a Florentine finish and award Gilmore $3,500 in damages for their conversion.

### 4.  *18-Karat Gold Pin with Flower Motif*

The facts regarding the gold pin with a flower motif are the same as those with respect to the cufflinks, with the exception that there is no evidence that the pin was ever appraised by Playhouse Jewelers.  D. Gilmore provided Cohen with a detailed description of the pin and a photograph depicting the item.  *See* Pl.'s Ex. 10C.  Both matched the description of the pin listed on the November 12, 2005, pawn ticket.  The pawn ticket described the pin as being round with blue stones.[6]  That corroborates D. Gilmore's description of the pin as containing blue sapphires, along with the photograph, which depicts a pin with blue circular stones.  Accordingly, I hold that the flower motif pin pawned and never returned to B. Gilmore was the one that D. Gilmore purports it to be.  I adopt Cohen's valuation of the gold pin with a flower motif and award Gilmore $3,950 in damages for its conversion.

### 5.  *14-Karat Gold Circle Leaf Pin*

The facts regarding the gold circle leaf pin are substantially the same as those with respect to the flower motif pin and cufflinks.  D. Gilmore provided Cohen with a detailed description of the pin and a photograph depicting it.  Both descriptions matched a pin listed on the November 12, 2005, pawn ticket, which described the pin as having "leaves," and containing round blue stones.  For the reasons set forth above, I adopt Cohen's valuation of the gold circle leaf pin and award Gilmore $3,950 in damages for its conversion.

---

[6] For reasons stated above, the pawn ticket's characterization of the pin as 14-karat, not 18-karat, is not dispositive. I find D. Gilmore's description of the pin as 18-karat gold to be credible.  Regardless, as Cohen testified, the difference in value between an 18-karat item and a 14-karat item is not significant.  Pawn King bears the "uncertainty of proof."  *See Perma Research*, 542 F.2d at 116.

6. *18k Gold $5 Indian Head Gold Cufflinks*

With respect to the Indian head cufflinks, D. Gilmore testified that, though he did not have any pictures of the items, he remembered them vividly.  He provided Cohen with a detailed description of the items along with a replacement cost quote from Peter Suchy Jewelers.  That description matched the November 12, 2005 pawn ticket, which described the cufflinks as "Indian Head Coin" cufflinks, made by Dunhill.  D. Gilmore does not claim that these cufflinks came from Tiffany's, and it appears there is no dispute that the cufflinks on the pawn ticket are the same ones that D. Gilmore described to Cohen.  Accordingly, I adopt Cohen's valuation of the Indian head cufflinks and award Gilmore $1,550 for their conversion.

7. *Tanzanite Diamond Engagement Ring*

The last piece of jewelry that D. Gilmore testified about was his mother's tanzanite ring. D. Gilmore testified that the ring was his mother's engagement ring and that, though he could not provide any prior appraisals or pictures of the item, he remembered it vividly.  He described the ring as containing a blue, square tanzanite stone surrounded by twelve small diamonds.  He also testified that it was made by Tiffany's.

D. Gilmore testified that his vivid memory of the ring was due to the fact that his mother wore it frequently and that he was attracted to it as a child.  Further, he testified that his mother told him that, should he ever get engaged, he could use the ring as an engagement ring for his fiancée.  As a result of the significance of the ring, D. Gilmore testified that he was aware of its details, including the carat size.

It is important to note that, although D. Gilmore does not provide any other corroborating evidence with respect to the tanzanite ring, his description of the ring matches the description on the November 12, 2005, pawn ticket.  The pawn ticket lists a ring that was blue with diamonds

16

on it.  Such corroboration, along with D. Gilmore's credible testimony regarding the specific details of the ring, makes it more likely than not that the pawned ring was in fact the tanzanite ring.  The fact that the pawn ticket did not list the ring as being made by Tiffany's is not dispositive.  Given D. Gilmore's description of the ring as being from Tiffany's, and his family's practice of purchasing jewelry from Tiffany's, it is credible that his father purchased the engagement ring from Tiffany's.  Accordingly, I adopt Cohen's valuation of the tanzanite ring and award $19,000 for its conversion.

       8.  *Coin Collection*

     D. Gilmore testified that his mother had also pawned various collectible coins.  Prior to the coins being pawned, D. Gilmore testified that he compiled a handwritten inventory of the coins to be sold.  *See* Exhibit 2.  According to his testimony, he compiled the list just as his mother was taking the boxes of coins out of the safe.  After looking in the boxes to make sure that the coins were accounted for, he would record the amount and type of coins and then place the coins into a suitcase.  Then, D. Gilmore testified, he and his mother took the suitcase to Pawn King so that Gilmore could pawn the coins in exchange for cash.

     The December 23, 2005, pawn ticket, which D. Gilmore agrees is the ticket that related to the coin transaction, stated that Gilmore pawned eighty-seven $5 coins, two $50 coins, eight $1 silver coins, and ten 50-cent silver coins.  During cross-examination, D. Gilmore testified that his mother had in fact pawned more coins than those listed in the pawn ticket.  However, D. Gilmore has no evidence of this fact besides his self-serving testimony that he packed a couple hundred coins into the briefcase that was later brought to Pawn King.

     Mingione contests the allegation that B. Gilmore pawned more coins than were listed on the pawn ticket.  In fact, Mingione testified that B. Gilmore had only pawned eight $5 coins, not

eighty-seven.  Mingione testified that the listing of "87" on the pawn ticket must have been a result of a typographical error.  Mingione said that, while typing the digit "8," his finger must have slipped to hit the "7" key as well.

D. Gilmore tries to point to his handwritten inventory lists to establish that his mother had pawned far more coins than were listed on the pawn ticket.  *See* Exhibit 2.  There were three pages of Exhibit 2 and it is unclear which, if any, portion of Exhibit 2 contains accurate information.  Moreover, even if accurate, the lists do not corroborate D. Gilmore's testimony.  Page one of Exhibit 2, the first handwritten list, corroborates Mingione's testimony that B. Gilmore had pawned eight $5 coins, not eighty-seven.  The second page of Exhibit 2, even less legible than the first one and written with a different pen, contains indicia of inauthenticity and/or inaccuracy in the form of strikethroughs and cross-outs.  The third and final page of Exhibit 2 is similar, though not identical, to the first page.  It also indicates that there were eight $5 coins.  Finally, and perhaps most importantly, the number eighty-seven is not listed anywhere on any of the Gilmore's handwritten lists (except as part of the number "1987", which presumably indicates the year that certain coins were minted).[7]

I find that the pawn ticket reflects the coins that were actually pawned.  I also find Mingione's testimony regarding the accidental typing of a "7" to be credible, such that the number of $5 coins that B. Gilmore pawned was more likely eight than eighty-seven.  Accordingly, I find that B. Gilmore pawned eight $5 coins, two $50 coins, eight $1 silver coins, and ten 50-cent silver coins.

---

[7] In addition to the possibility that Mingione's finger slipped, causing him to type "87" instead of "8," it is also possible that Mingione typed "87" to reflect that the $5 coins were minted in 1987.  Such a possibility is corroborated by Montgomery's expert report, which lists the $5 coins as being minted in 1987, and D. Gilmore's handwritten lists, which contain "1987" next to the entry for the $5 coins.

Because the parties do not dispute Montgomery's valuation of the coins at issue, I adopt his factual findings regarding their respective values. As noted in my earlier discussion of conversion damages, the measure of conversion damages is the market value of the item at the time of the conversion. Thus, I hold that the appropriate measure of damages is based on Montgomery's findings with regard to the market value of the coins as of July 2008. *See* Pl.'s Ex. 3. Because Pawn King did not convert the goods to its own use until it sold them in July 2008, the conversion damages must be measured in accordance with the items' value on that date.

Montgomery opined that, on July 1, 2008, the coins were valued as followed: the $5 gold coins at $225 per coin; the $50 coins at $1,550 per coin; the $1 silver coins at $10 per coin; and the 50-cent silver coins at $7.25 per coin.[8] *See* Pl.'s Ex. 3. Ascribing those values to the coins at issue, the total amount of damages that resulted from their conversion is $5,052.50.[9]

E.  Total Conversion Damages

Based on my factual findings regarding the value of the pawned items that were never returned to B. Gilmore or her estate, I hold that Gilmore is entitled to conversion damages against Pawn King in the amount of $53,827.50, plus interest. That figure represents damages that resulted from the defendants' conversion of B. Gilmore's "Diamonds by the Yard" necklace

---

[8] Exhibit 3 sets forth Montgomery's opinion regarding the value of various coins, many of which I have determined are not subject to the existing dispute over damages because Gilmore could not establish that she had pawned those coins. The parties did not do a good job identifying which coins on the December 23, 2005 pawn ticket correspond to which type of coin valued by Montgomery. However, through process of elimination, I have determined that the $50 coins at issue are described by Montgomery as the "1987 $50 GAE PR," the $5 coins are described as the "1987 $5 Gold Constitution," the $1 silver coins are described as part of the "1987 $5 Gold Constitution and $1 Silver Set," and the 50-cent silver coins are described as the "1982 Washington Half Dollar." *See* Pl.'s Ex. 3. With regard to the $1 silver coins, I have determined their value by subtracting the value of the $5 Gold Constitution coin from the value of the $5 Gold Constitution and $1 Silver set. Doing so results in the value of the $1 Silver coin standing alone ($235 for the set, minus $225 for the $5 Gold Constitution coin, yields a value of $10 to be ascribed to the $1 Silver coin).

[9] Eight $5 coins x $225 per coin = $1800. Two $50 coins x $1,550 per coin = $3,100. Eight $1 silver coins x $10 per coin = $80. Ten 50-cent coins x $7.25 per coin = $72.50. The total value of the coins at issue is $5,052.50 ($1,800 + $3,100 + $80 + $72.50 = $5,052.50).

($8,000), gold and emerald cufflinks ($8,825), gold cufflinks with Florentine finish ($3,500), gold pin with flower motif ($3,950), gold leaf pin ($3,950), $5 Indian head cufflinks ($1,550), tanzanite diamond ring ($19,000), and coin collection ($5,052.50).

Under Connecticut law, "interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions ... as damages for the detention of money after it becomes payable." Conn. Gen. Stat. § 37–3a. "An award of prejudgment interest under section 37–3a is an equitable determination within the discretion of the court." *Garnet Analytics, Inc. v. Diversified Solutions, Inc.*, 2013 WL 6511940, at *8 (D. Conn. Dec. 12, 2013) (citing *Brandewiede v. Emery Worldwide*, 890 F. Supp. 79, 82 (D. Conn. 1994)). Before it can award interest, a court must first determine "(1) whether the party against whom the interest is sought has wrongfully detained money due the other party; and (2) the date upon which the wrongful detention began in order to determine the time from which interest should be calculated." *Sears Roebuck & Co. v. Bd. of Tax Review*, 241 Conn. 749, 763 (1997). If I determine that interest is appropriate in this case, I have the discretion to award up to ten percent interest, but also the discretion to award less. *Id.* at 765–66.

I have already ruled that Pawn King wrongfully disposed of B. Gilmore's property in July 2008. Pawn King received cash as a result of the disposal of B. Gilmore's property and it failed to return that money to B. Gilmore. Because of Pawn King's wrongful conduct, B. Gilmore was deprived of the opportunity to use and earn interest on the money she was owed. Accordingly, the demands of justice require an award of interest from the date of the conversion, July 2008, to the date of this judgment.

Although I am permitted to award a prejudgment interest rate of up to ten percent per annum, I will award a rate that more accurately reflects the market conditions during the relevant

period, specifically, three-and-one-half percent.  *See Cadle Co.*, 2014 WL 3962469, at *4.

Three-and-one-half percent reflects a rough approximation of the average bank prime interest

rate during the relevant period, from July 2008 to March 2016.  That rate will be applied to

produce a total prejudgment interest award derived from a simple interest calculation of three-

and-a-half percent per annum.  Applying an interest rate of three-and-a-half percent per annum to

a principal amount of $53,827.50 for a period from July 2008 to March 2016, I award Gilmore

$16,055.32 in prejudgment interest.  Accordingly, the total damages for the conversion claim

against Pawn King amounts to $69,882.82.

F.  Defendants' conduct does not warrant punitive damages

An award of punitive damages under CUTPA is discretionary.  *See Gargano v. Heyman*,

203 Conn. 616, 622 (1987).  A court may only consider awarding punitive damages if there is

evidence that the defendant exhibited "a reckless indifference to the rights of others or an

intentional and wanton violation of those rights . . . ."  *Ulbrich v. Groth*, 310 Conn. 375, 446

(2013).  Claims for punitive damages are warranted in cases where there is "wanton and

malicious injury," or an "evil motive."  *Id.*

There is no evidence of malicious conduct on the part of Pawn King.  D. Gilmore

testified that Mingione was "very respectful" of his mother and acknowledged that Mingione did

not require B. Gilmore to make interest payments for each month during the relevant time

period.  Although D. Gilmore contested the number of interest payments that were made by his

mother, he admitted that he had no proof that his mother made additional payments.  The parties'

stipulation establishes that there were significant gaps in B. Gilmore's payments.  Such gaps

show that Pawn King, through Mingione, did not require her to make payments each month.

Furthermore, Gilmore did not present sufficient evidence to establish that Pawn King acted with an "evil motive."  It is unclear whether Pawn King intentionally violated B. Gilmore's rights.  In fact, Mingione's testimony indicates that he thought that his conduct was lawful.  Though that fact does not absolve Pawn King's liability under CUTPA, it does suggest that punitive damages are unwarranted.  Accordingly, I find that Gilmore is not entitled to punitive damages.

## III.    Conclusion

For the foregoing reasons, Gilmore is entitled to treble damages under RICO in the amount of the unlawful interest payments it made to Pawn King, minus the amount of cash B. Gilmore received from Pawn King as a result of the pawn transactions.  That figure amounts to $3,360.  Because Mingione is the sole defendant in Count I, he is liable for the full amount of those damages.

Under both RICO and CUTPA, Gilmore is entitled to reasonable attorneys' fees, in the amount of $66,950, plus allowable costs.  The defendants are jointly and severally liable for this amount because Mingione is liable for attorneys' fees and costs under RICO, and Pawn King is liable for the same under CUTPA.

 Further, Gilmore is entitled to conversion damages in the amount of the market value of the goods that were not returned to B. Gilmore's estate, plus prejudgment interest.  The total conversion damages amounts to $69,882.82.  Because Pawn King is the sole defendant in Count IV, it is liable for the full amount of damages as a result of its conversion.  Gilmore is not entitled to additional compensatory or punitive damages under his CUTPA claim or his unjust enrichment claim because those damages have already been taken into account in awarding him damages under his RICO and conversion claims.

The clerk shall enter judgment and close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 25th day of March 2016.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge